IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**JUSTIN FREEMAN**                                                                                    **PLAINTIFF**

V.                                         CASE NO. 5:23-CV-5065

**MADISON COUNTY, ARKANSAS**
**and LYNN WHITTLE, in his individual**
**and official capacities**                                                                        **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This case was brought by Plaintiff Justin Freeman after Defendant Lynn Whittle—a Madison County Sheriff's Deputy and School Resource Officer—allegedly used excessive force against Mr. Freeman, who was a seventeen-year-old student at Huntsville High School at the time. Now before the Court are Separate Defendant Madison County's Motion for Summary Judgment (Doc. 17) and Defendants Madison County's and Lynn Whittle's Joint Motion to Exclude Expert Testimony (Doc. 24). For the foregoing reasons, Defendant Madison County's Motion for Summary Judgment is **GRANTED** and Defendants' Motion to Exclude is **GRANTED IN PART** and **DENIED IN PART**.

The question at issue in Madison County's Motion for Summary Judgment is narrow. Importantly, it does not call upon the Court to assess whether Officer Whittle violated Mr. Freeman's constitutional rights: Officer Whittle has not sought summary judgment and Madison County does not seek summary judgment on that basis. Rather, the Court need only decide whether Madison County can be held liable for causing a constitutional violation *itself*—specifically by failing to train Officer Whittle.

1

## I. Background

### A. The Altercation

On the morning of February 9, 2024, Mr. Freeman reported to class at Huntsville High School. When he arrived to the classroom, the teacher informed him he was in the wrong room. The facts at summary judgment do not fully establish what occurred, but Mr. Freeman ended up in the school resource office with then-Assistant Principal, Zachary Vest, and Officer Whittle. Officer Whittle had worked as a School Resource Officer for Madison County for approximately three years, after leaving his job working at a jail in Washington County.

Once in the school resource office, Mr. Freeman refused to give his name to Officer Whittle until his parent or guardian arrived. Officer Whittle threatened that he would take Mr. Freeman down to the courthouse if he continued to refuse to comply.

Mr. Freeman again declined to speak to Officer Whittle and Mr. Vest, as he was still awaiting his parent or guardian to arrive at the school. According to Mr. Freeman's and Mr. Vest's accounts, Officer Whittle then crossed the room to where Mr. Freeman was sitting and grabbed him by the throat, lifting him out of his chair. *See* Doc. 22, p. 4; Doc. 22-4, p. 6 (Mr. Vest stating, ". . . Officer Whittle just basically picked him up by the neck."). An altercation between the two then ensued. Some of the evidence suggests that Officer Whittle put Mr. Freeman into a second chokehold,[1] *see* Doc. 32-2, p. 11, as the two struggled on the ground. The confrontation ended with Officer Whittle firing his taser

---

[1] Both Madison County policy and the expert report in this case discuss technical definitions of this term. In using this term, the Court means it in a general, not technical, sense.

2

into Mr. Freeman's hip, tasing him, and handcuffing him.[2] The parties dispute the degree of Mr. Freeman's injuries. Mr. Vest witnessed the entirety of these events.

## B. Training and Policies

It is undisputed that Officer Whittle was not trained or certified in the use of the specific taser provided by the Madison County Sheriff to its deputies, despite Madison County's policies requiring as much.

The Madison County Sheriff's Office has a written policy meant "[t]o provide officers with guidance and direction on the use of electronic control devices (ECD)[,] oleoresin capsicum (OC) Spray[, and firearms]." (Doc. 19-1, p. 28). The policy states:

- No Officer will be authorized to carry a firearm, ECD, or OC Spray until they have been trained and qualified with that weapon.

- All Officers will qualify annually with their duty weapons.

- All Officers will receive annual training on this policy, de-escalation procedure, and encounters with individuals with impaired mental health, homelessness, and addiction.

*Id.* at p. 29. The policy describes an ECD as "[a] device designed to disrupt a subject's central nervous system by deploying a battery-powered electric energy sufficient to cause uncontrolled muscle contraction and override voluntary motor responses." *Id.* It sets out that the appropriate circumstance to use an ECD is when an officer needs to "control subjects engaged in or exceeding verbal resistance (before a forceful hand on contact . . .) is needed." *Id.*

The policy lays out standards for ECD use, including:

> The decision to use the ECD shall be made based upon the actions of the subject or threats facing the officer and the totality of the circumstances of the incident. The use of this device must be reasonable and necessary. The

---

[2] Defendant Whittle pled guilty to state charges of misdemeanor battery for these actions.

3

> ECD may be used if verbal direction has failed to obtain the subject's compliance, and the subject has signaled his intention to actively resist the officer's efforts to affect an arrest or custody.

*Id.* at p. 30. It also lists various circumstances in which the use of an ECD is forbidden, such as

- when "the use of the device <u>is not</u> reasonably necessary to prevent harm to an officer or another person or to affect a lawful arrest," *id.* at p. 31 (emphasis in original), or

- when it is used "[i]n a punitive manner or to unlawfully coerce another." *Id.*

The policy makes explicit, "The ECD <u>is not</u> to be used to gain compliance over subjects who <u>are not</u> presenting an immediate, credible threat to the safety of the officer/jailer or the public. <u>It will never be used as punishment</u>." *Id.* (emphasis in original). The policy includes several other instructions on ECDs, other duty weapons, and the use of force.

It is undisputed that the Sheriff, Ronnie Boyd, expected his deputies to perform their tasks pursuant to these policies. *Id.* at p. 1; *see also* Doc. 21, p. 1. Sheriff Boyd stated that, prior to February 9, 2022, he "had no knowledge of any deficiencies in [Madison County's] policies, training or supervision." (Doc. 19-1, p. 2). Though Mr. Freeman technically disputes this, he does not provide argument or evidence that Sheriff Boyd was indeed aware that Officer Whittle had insufficient training. *See* Doc. 21, p. 4.

Officer Whittle was trained and certified in the use of his firearm and OC spray, as required by County policy. *See* Doc. 22-3, pp. 7–8. Relevant here, he also had been trained in the Duty to Intervene (September 2021), Youth Mental Health First Aid (April 2021), the Duty to Protect Citizens (March 2021), Neck Restraints (February 2021), and Response to Resistance Use of Force (March 2020), among various other trainings. *See* Doc. 22-2. He also received 528 hours of basic police training (January 2020) and 40

4

hours of School Resource Officer Basics (July 2020). *Id.* He was a field training officer with Madison County for approximately two months and then shadowed another School Resource Officer. *See* Doc. 22-5, p. 3. Following the incident here, Officer Whittle took approximately forty training courses in less than two months, including De-escalation, Racial Profiling, Taser Immediate Danger, Use of Force Moving Forward, Deadly Force, Response to Resistance Use of Force, and Neck Restraints—among others. *Id.*

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Under Federal Rule of Civil Procedure 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248).

## B. Discussion

Again, the question at bar is narrow and only asks this Court to decide whether Madison County can be held liable for failing to train Officer Whittle. In *Monell v. Department of Social Services of City of New York*, the Supreme Court held that a local government may be sued under § 1983 for official municipal policies and unofficial customs that it adopts. 436 U.S. 658, 690 (1978). Just over a decade later, the Supreme Court clarified that, in limited circumstances, a local government may be liable under § 1983 for failing to adequately train its officials. *City of Canton, Ohio v. Harris*, 389 U.S. 378 (1989).

In such cases, courts impose rigorous culpability and causation requirements to prevent local governments from being held liable via *respondeat superior*. Thus, a county may be liable "only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact," as it is only where there is a "'deliberate' or 'conscious' *choice*" that the "shortcoming [may] be properly thought of as a [ ] 'policy or custom' that is actionable under § 1983." *Id.* at 388–89 (emphasis added). "A showing of simple or even heightened negligence will not suffice" to establish a failure-to-train claim against a county. *Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown*, 520

U.S. 397, 409 (1997).³ The failure to train must also be the "moving force" in causing the constitutional violation. *Canton*, 489 U.S. at 389 (citing *Monell*, 436 U.S. at 694).

A county "may be deemed deliberately indifferent" where it retains a training program despite its "policymakers [having] actual or constructive notice that a particular omission in [the] program causes [ ] employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Ordinarily, it is necessary for a plaintiff to present a "pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* In assessing failure-to-train cases, courts should look to the substance of the training "not the particular instructional format." *Id.* at 68.

Alternatively, there are "a narrow range of circumstances" where failure-to-train liability may be imposed for a single instance of a constitutional violation. *Brown*, 520 U.S. at 409. Such circumstances may exist where, "in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. That is, where "the unconstitutional consequences of failing to train [are] so patently obvious," municipal liability may be fixed "without proof of a pre-existing pattern

---

³ The facts in *Brown* involved a claim for inadequate screening policies when hiring sheriff's deputies. However, *Brown* extensively discussed failure-to-train jurisprudence, has become part of the canon of law for failure-to-train cases, and is regularly cited in such cases.

7

of violations." *Connick*, 563 U.S. at 64. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcoming may have resulted from factors other than a faulty training program. . . . It may be, for example, that an otherwise sound program has occasionally been negligently administered." *Canton*, 489 U.S. at 390-91; *see, e.g., Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1123 (8th Cir. 2005); *Thelma D. By & Through Delores A. v. Bd. of Educ. of St. Louis*, 934 F.2d 929, 934-35 (8th Cir. 1991).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Here, Mr. Freeman has failed to create a genuine issue of material fact that Madison County acted with the requisite deliberate intent. There is no evidence in the record to support that this was anything more than negligence. To view the failure itself as indicative of something more would be mere speculation.

To start, Mr. Freeman "does not claim . . . any pattern of injuries" that would evince that the County was on notice yet *deliberately* proceeded in its harmful training procedures nonetheless. *See Brown*, 520 U.S. at 408. The only constitutional violation in the record is the single occurrence at issue in this case, and there is no evidence that any other officer—or even Officer Whittle himself—missed other trainings. This cuts against notice and, therefore, against deliberateness.

To be sure, there are occasions where the constitutional consequences of failing to train are "so obvious" that a county may be deemed deliberately indifferent even where there is only a single incident. *Canton*, 489 U.S. at 390; *Connick*, 563 U.S. at 64. However, single-instance liability still looks to whether the "[county's] *decision* not to train [ ]

officers . . . reflect[s] the [county's] deliberate indifference to the 'highly predictable consequences,' namely violations of constitutional rights." *Connick*, 563 U.S. 63–64 (emphasis added) (quoting *Brown*, 520 U.S. at 409).

In the instant case, there is no evidence that Madison County made the *decision* not to train Officer Whittle on his taser. In fact, there is no evidence that it even had knowledge of his lack of training. Rather, Madison County had adequate and thorough policies in place that required their officers to be trained and annually certified in the use of each of their weapons, including the taser, and the officers were expected to comport with this policy. These policies included information on appropriate use of force in various situations. And there is no suggestion that Officer Whittle was unable to access these policies. The evidence further shows that Officer Whittle received many hundreds of hours of basic training and training specifically relevant to his job as a School Resources Officer in the several years prior to the incident, including serving as a field training officer and shadowing another School Resources Officer. Upon review of the record, the failure to receive taser training appears to be a "deviation" from Madison County's ordinary training practices and policies. *See Brown*, 520 U.S. at 407 (stating that the respondent sought to "trace liability to what can only be described as a deviation" from the sheriff's usual practices where the respondent did "not claim that she [could] identify any pattern of injuries," did not assert that the sheriff's practices were "generally defective," and "[t]he only evidence . . . suggested that [the sheriff] had adequately screened the backgrounds of all prior deputies"). There simply is no evidence that Madison County made any deliberate or conscious decision not to train Officer Whittle in the use of his taser.

That Officer Whittle, alone, was "unsatisfactorily trained [can]not alone suffice to fasten liability" on Madison County because Officer Whittle's actions "may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. Here, there is no evidence that Officer Whittle's actions were the result of anything other than his *own* shortcomings or, possibly, negligent administration of the County's training program. Neither of these are sufficient to create a genuine issue of material fact that Madison County acted with "deliberate indifference" to peoples' constitutional rights and that such indifference was the "moving force" behind Officer Whittle's actions.

"In virtually every instance where a person has had his or her constitutional rights violated by a [county] employee, a § 1983 plaintiff will be able to point to something the [county] 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392. Courts must, therefore, be mindful of the high standards of fault and causation for municipal liability in failure-to-train cases lest courts risk imposing "*de facto respondeat superior liability* on municipalities—a result [the Supreme Court] rejected in *Monell*." *Id.* The Court is mindful of this risk and concludes that *Monell* liability cannot apply where, as here, there is no evidence of any deliberate or conscious decision on behalf of the county.

### III. MOTION TO EXCLUDE EXPERT TESTIMONY

#### A. Legal Standard

The decision whether to exclude expert testimony is committed to a district court's discretion—subject, of course, to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (2014). Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Eighth Circuit has "boiled down" these requirements into a three-part test:

First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)). The proponent of expert testimony bears the burden of showing by a preponderance of the evidence that these requirements are satisfied. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 702. However, "[e]xpert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (internal citations omitted).

To prove useful to a jury, an expert's opinion should rely on their specialized knowledge; "[w]here the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984). Further, an expert should not make unsupported assertions that go beyond their area of expertise. *See Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th

11

Cir. 2003) (finding the district court did not abuse its discretion where it prohibited an expert from testifying on matters admittedly beyond his expertise). To that end, an expert should not opine on legal conclusions, as these will not assist the jury either. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir.1995) ("The legal conclusions were for the court to make. It was an abuse of discretion to allow the testimony.").

## B. Discussion

Mr. Freeman retained Michael Leonesio to provide expert opinion on the use of force and county policies in this case. Mr. Leonesio's curriculum vitae (Doc. 32-1), initial report (Doc. 32-2), supplemental report (Doc. 22-1), and a two-page excerpt of his deposition transcript (Doc. 22-6) have been filed with and reviewed by the Court.

Mr. Leonesio specializes in, among other things, law enforcement training and policy review analysis with a focus on use of force. In his initial report, completed in December 2023, Mr. Leonesio offers opinions on the appropriateness of Officer Whittle's use of the chokehold and taser. Because the Defendants "do not move to exclude Leonesio's supplemental opinions about standard police training," *see* Doc. 36, p. 1, the Court will not address Mr. Leonesio's supplemental report.[4] Defendants do not challenge Mr. Leonesio's expertise, and the Court's review of Mr. Leonesio's CV and qualifications establish that he is sufficiently qualified. Instead, the Defendants assert that Mr. Leonesio

---

[4] The Court notes, however, that such testimony is unlikely to be relevant at trial considering the Court's findings on summary judgment.

12

should be prohibited from offering his opinion because it constitutes an impermissible legal conclusion and invades the fact-finding role of the jury.

Defendants argue that Mr. Leonesio offers impermissible legal conclusions by opining, analyzing, and making conclusions on the reasonableness of Officer Whittle's actions through the framework of constitutional law. Courts in this circuit "have repeatedly found that an expert's opinion about whether an officer's conduct was 'reasonable' in light of constitutional standards is a legal conclusion that does not assist the jury in determining the facts and is thus inadmissible." *Ball-Bey v. Chandler*, 2023 WL 5173976, at *4–5 (E.D. Mo. Aug. 10, 2023) (finding a similar expert report inadmissible because it constituted legal conclusions and collecting cases in accord); *see also Lombardo v. Saint Louis City*, 2019 WL 414773 (E.D. Mo. Feb. 1, 2019) (analyzing an opinion by Mr. Leonesio and finding that a substantial part was impermissible legal conclusion).

Whether an officer's use of force is reasonable or constitutionally excessive is a question of law. *See Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017). In *Peterson v. City of Plymouth*, which Defendants primarily rely on, the Eighth Circuit held that the district court had abused its discretion in allowing an expert to testify on "his views concerning the reasonableness of the officers' conduct *in light of 'Fourth Amendment standards'*" because such testimony "was not a fact-based opinion, but a statement of legal conclusion." 60 F.3d at 475 (emphasis added); *accord Schmidt v. City of Bella Vista*, 557 F.3d 564, 570 (2009). Like the court in *Lombardo*, this Court is "persuaded by *Peterson* and its progeny, including some very recent cases within this district addressing

13

and admissibility of police policies and practices expert testimony." *See Lombardo*, 2019 WL 414773, at *9 (collecting cases).[5]

For the most part, Mr. Leonesio's opinion, as written, is an application of case law to the facts in this case. In other words, Mr. Leonesio primarily opines on reasonableness "in light of" constitutional standards—which Mr. Freeman concedes is impermissible under *Peterson*. By the Court's count, Mr. Leonesio's report has over thirty-five citations to case law, including quotations, listing elements, and a string cite with parentheticals. Though Mr. Leonesio states that he uses this framework "strictly as a law enforcement professional," legal conclusions by law enforcement professionals are still legal conclusions, which Mr. Leonesio is not qualified to make. Thus, this Court "decline[s] to permit Mr. Leonesio, either through his report, deposition, or other testimony, to offer legal conclusion that touch upon the ultimate legal issues in this case"—that is, whether Officer Whittle's actions were reasonable under constitutional standards. *Lombardo*, 2019 WL 414773, at *10; *see also Zorich v. St. Louis Cnty.*, 2018 WL 3995689, at *3 (E.D. Mo. Aug. 21, 2018) (similar).

---

[5] Mr. Freeman argues that the Eighth Circuit has allowed experts to testify as to reasonableness in other cases, but the Court does not find the cited cases dispositive. In at least one of these cases, the admissibility of the expert's testimony was not at issue. *Wilson v. City of Des Moines*, 293 F.3d 447 (8th Cir. 2002). In another case, whether the expert opinion constituted a legal conclusion was not at issue. *Crawford v. Bundick*, 32 F. App'x 785, 786 n.3 (8th Cir. 2002) (per curiam). In the case that addressed whether the opinion was legal conclusion, the Eighth Circuit stated that whether the testimony was admissible was a "close call," but its admission was not "manifestly egregious." *Wade v. Haynes*, 663 F.2d 778 (8th Cir. 1981). The fact that a lower court's decision was deemed to not be "manifestly egregious" is not the rousing precedential support this Court looks for in making its decision. Further, Mr. Freeman's citations to these cases overlooks the fact that much of Mr. Leonesio's report reads as legal analyses and conclusions. *See also Lombardo*, 2019 WL 414773, at *9 (discussing these cases in reference to a similar report by Mr. Leonesio).

To be sure, "a police procedure expert's testimony may be proper on issues other than the reasonableness of an officer's conduct under Fourth Amendment standards." *Lombardo*, 2019 WL 414773, at *9. And Mr. Freeman assures the Court that "Plaintiff will not elicit testimony from Mr. Leonesio about the Fourth Amendment, *Graham*, or any other issues of law." (Doc. 32, p. 12). To that end, the Court declines to bar all testimony from Mr. Leonesio as aspects of his opinion may be proper and helpful by, for example, "contextualiz[ing] the evidence the jury will hear about the use of force by the defendant against the plaintiff, in light of the standards practiced by officers throughout the country." *Lombardo*, 2019 WL 414773, at *9 (alterations in original) (quoting *Sloan v. Long*, 2018 WL 1243664, at *3 (E.D. Mo. Mar. 9, 2018)); *see also Zorich*, 2018 WL 3995689, at *2 ("[E]xpert testimony on police policy and practices is generally admissible in a Section 1983 case." (citing *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003))).

> The Eastern District of Missouri has further demarcated this boundary:
>
> While "expert opinions can embrace the ultimate issue of *fact* . . . including whether standards or practices are applicable to a given situation and whether those standards or practices were met in the situation [under Federal Rule of Evidence 704,] . . . an expert cannot testify that following or failing to follow certain standards met or failed to meet the applicable legal standard, such as the reasonableness of [the defendant officer's] actions."

*Lombardo*, 2019 WL 414773, at *9 (alterations in original) (quoting *Sloan*, 2018 WL 1243664, at *3). Thus, "[t]o the extent that Plaintiff proffers Mr. Leonesio's testimony to discuss the generally recognized standards and practices for using force under the circumstances of this case, such testimony would be admissible." *Id.* at *10 (citations omitted); *see also Zorich*, 2018 WL 3995689, at *3 (similar). Any such testimony, of course, would be cabined to what is already included in Mr. Leonesio's initial and

supplemental reports.[6] For example, Mr. Leonesio could testify as to the use—or lack thereof—of warnings and de-escalation in this case. Such testimony is distinct from the application of law to facts and is still consistent with *Peterson*.

Defendants further contend that Mr. Leonesio's opinion invades the province of the jury by giving his version of the facts. To the extent that Mr. Freeman plans to elicit Mr. Leonesio's opinion as to what *in fact* occurred, Mr. Leonesio may not offer such testimony because it is the role of the jury alone to make factual findings. But there exists a "critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine. The former is manifestly improper, the latter is not." *Sloan*, 2018 WL 1243664, at *4 (internal quotations omitted). Mr. Leonesio may provide context and explanations to aid the jury in understanding the evidence presented, and he may use factual assumptions when forming his opinion. "It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." *Id.* (quoting *Williams v. Illinois*, 567 U.S. 50, 57 (2012)). For example, Mr. Leonesio may opine as to whether Mr. Freeman was passively or actively resisting Officer Whittle. *See* Doc. 32-2, pp. 8, 16. As another example, he may explain

---

[6] In their Reply, Defendants argue that "Leonesio cannot explain his opinions without mentioning the case law, and for him to try to do so would be outside the scope of his expert report. In that case, Defendants have not had the opportunity to examine Leonesio about the basis of his opinions in discovery." (Doc. 36, pp. 1-2). While the Court's holding whittles down Mr. Leonesio's opinion, there remain permissible opinions within the scope of his report, as explained *infra*. Further, Mr. Leonesio's report states that his opinion is based on his expertise and knowledge detailed in his CV and report. (Doc. 32-2, p. 5). The Court does not see why Defendants would not have had the opportunity to examine Mr. Leonesio on these bases of his opinion. Of course, the Court reserves the right to further limit Mr. Leonesio's testimony if it exceeds the scope of his report.

the different types of chokeholds and why he believes two chokeholds occurred based on their distinct features. *See* Doc. 32-2, pp. 9–10. These opinions are reliable, in that they depend on Mr. Leonesio's expertise and are based on the evidence, and they are relevant because they would help the jury.

In summary, to the extent such opinions are contained in his expert reports, Mr. Leonesio "may testify regarding the generally recognized standards and practices for using force under the circumstances of this case," but he is prohibited from offering "opinions or conclusions that touch upon the ultimate legal issues in this case, including whether Defendants' actions were excessive, unnecessary, or otherwise unreasonable under the totality of the circumstances and in light of Fourth Amendment standards." *Lombardo*, 2019 WL 414773, at *15.

## IV. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Madison County's Motion for Summary Judgment is **GRANTED** and Defendants' Motion to Exclude Expert Testimony is **GRANTED IN PART** and **DENIED IN PART**. Because the suit against Lynn Whittle in his official capacity is technically a suit against the county itself, the grant of summary judgment dismisses both Madison County and Lynn Whittle in his official capacity from this case. Thus, only claims against Defendant Lynn Whittle in his individual capacity remain.

**IT IS SO ORDERED** on this 18th day of June, 2024.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

17